FILED'10 OCT 18 10:47USDC-ORM

Larry Denton and Kathleen Harrison [Family: Smith], *in esse*,
In care of: 2036 Pleasant Creek Road
Rogue River (37), Oregon,
United States of America

Petitioners *in propria persona*[1]

# United States District Court
## District of Oregon
(Medford Division)

| | |
|---|---|
| Larry Denton and Kathleen Harrison [Family: Smith], *in esse*, Principals, Lenders-in-Fact, and Real Parties-in-Interest,<br><br>        Petitioners<br><br>     v.<br><br>U.S. BANK, N.A., a wholly owned subsidiary of U.S. BANKCORP, a foreign corporation, individually, and as Trustee for the Registered Holder of ASSET BACKED SECURITIES CORPORATION HOME EQUITY LOAN TRUST, Series 2005-HE1 Asset Backed Pass-Through Certificates, Series 2005-HE1; Richard K. Davis, individually and as agent; Michelle Moeller, individually and as agent; SAXON MORTGAGE SERVICES, INC., individually and as agent; David L. Dill, individually and as agent; Robin Chrostowaski, individually and as agent; NEW CENTURY MORTGAGE CORPORATION, subsidiary of NEW CENTURY FINANCIAL CORPORATION; Brad A. Morrice, individually and as agent; Patti M. Dodge, individually and as agent; Logan Rutherford, individually and as agent; OCWEN LOAN SERVICING, LLC, individually and as agent; Ronald M. Faris, individually and as agent; Christina Carter, individually and as agent; and all JOHN and JANE DOES 1-500, U.S. Trusts / Public Vessels inclusive,<br><br>        Defendant(s). | Civil Case No: **1:10-CV-3077-CL**<br><br>(In Admiralty)<br><br>**Amended Petition and Complaint for**:<br><br>1. **Civil Damages under inter alia**, **HOEPA** (15 USC Sec. 1639 et seq.), **FDCPA** (15 USC Sec. 1692 et seq.), **RESPA** (12 USC Sec. 2601 et seq.), **RICO** (18 USC Sec. 1964 et seq.), **TILA** (15 USC Sec. 1601 et seq.);<br><br>2. **Declaratory Relief** (28 USC Sec. 2201);<br><br>3. **Injunctive Relief** (28 USC Sec. 1651); and,<br><br>4. **Quiet Title**<br><br>**Trial-by-Jury Demanded** (In accord with FRCP Rule 38, and pursuant to the Seventh and Ninth Amendments to the Constitution of the United States)<br><br>**Action by Court Clerk Required** |

## Part I.  Mandatory Judicial Notice Requested (F.R.E. RULE 201(d)) 28 USC Sec. 2072(b), and 18 USC Sections 2, 3, 4, 241, 1341, 1343(3), 1346, 1956-1964 *et seq.*

---

[1] ***propria persona*** - In one's own person.  An appearance may be *in propria persona*, and need not be by attorney. [see: *e.g.*, <u>A Law Dictionary, Adapted to the Constitution and Laws of the United States</u> by John Bouvier, published A.D. 1856]

In addition to the foregoing Federal statute law the Petitioners lawfully request this honorable Court, all its judges, magistrates, and other court officers take **Judicial Notice** of the following adjudicative Facts pursuant to F.R.E. Rule 201(d):

1. There is massive systemic **criminal fraud** by the live agents of major banks in the mortgage lending industry against borrowers as well as investors being reported almost daily by the mainstream media and on the Internet (see annexed **Exhibit E**).

2. The Racketeering Influenced and Corrupt Organizations Act is to be read broadly (see: 18 USCA, Sections 1961-1968; also, see: *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985), 105 S. Ct. 3275, 87 L. Ed. 2d 346, dissenting opinion 473 U.S. 479, 105 S. Ct. 3292, 87 L. Ed. 2d 346).

3. The object of the civil Racketeering Influenced and Corrupt Organizations Act (RICO) is not merely to compensate victims but to turn them into prosecutors, that is to say **private attorneys general**, dedicated to eliminating racketeering activity (see: 18 USCA, Section 1961 et seq.; also, see: *Rotella v. Wood,* 528 U.S. 549 (2000), 120 S. Ct 1075, 145 L.Ed.2d 1047).

4. There is **no requirement** that a private treble damages action under Racketeering Influenced and Corrupt Organizations Act can proceed only against a defendant who has already been convicted of a predicate act or of a RICO violation; hence, fact that defendant corporation, which had entered into joint venture with plaintiff and which was allegedly cheating plaintiff by over-billing, and two of its officers had not been convicted under RICO or for the charged federal mail and wire fraud statutes did not bar private RICO action; disavowing *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 and result reached in *Furman v. Cirrito*, 741 F.2d 524 (see: 18 USCA, Sections 1962, 1964(c); also, see: *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985), 105 S. Ct. 3275, 87 L. Ed. 2d 346, dissenting opinion 473 U.S. 479, 105 S. Ct. 3292, 87 L. Ed. 2d 346).

5. No distinct "racketeering injury" requirement is necessary to maintain a private treble damages action under Racketeering Influenced and Corrupt Organizations Act; if defendant engages in a pattern of racketeering activity in a manner

forbidden by Section 1962 and the racketeering activities injured the plaintiff in his business or property, the plaintiff has a private claim for treble damages; disavowing *Alexander Grant & Co. v. Tiffany Industries, Inc.*, 742 F.2d 408; *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 and result reached in *Furman v. Cittiro*, 741 F.2d 524 (see: 18 USCA, Sections 1962, 1964(c); also, see: *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985), 105 S. Ct. 3275, 87 L. Ed. 2d 346, dissenting opinion 473 U.S. 479, 105 S. Ct. 3292, 87 L. Ed. 2d 346).

6.   The Racketeering Influenced and Corrupt Organizations Act's pattern of racketeering concept **does not** require allegation and proof of organized crime nexus (see: 18 USCA, Sections 1961(5), 1962; also, see: *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), 109 S. Ct. 2893, 106 L. Ed. 2d 195, on remand 734 F. Supp. 879, affirmed 954 F.2d 485, certiorari denied 504 U.S. 957, 112 S. Ct. 2306, 119 L. Ed. 2d 228).

7.   In enacting Racketeering Influenced and Corrupt Organizations Act, Congress wanted to reach both "legitimate" and "illegitimate" enterprises, and the former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences; the fact that private damages provision is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued (see: 18 USCA, Sections 1962, 1964(c); also, see: *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985), 105 S. Ct. 3275, 87 L. Ed. 2d 346, dissenting opinion 473 U.S. 479, 105 S. Ct. 3292, 87 L. Ed. 2d 346).

8.   Predicate acts of racketeering may form a pattern of racketeering activity under the Racketeering Influenced and Corrupt Organizations Act, even though they are not part of separate illegal schemes (see: 18 USCA, Sections 1961(5), 1962; also, see: *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), 109 S. Ct. 2893, 106 L. Ed. 2d 195, on remand 734 F. Supp. 879, affirmed 954 F.2d 485, certiorari denied 504 U.S. 957, 112 S. Ct. 2306, 119 L. Ed. 2d 228).

9.   Although proof that a RICO defendant has been involved in multiple criminal schemes would be highly relevant to inquiry into continuity of racketeering, proof

of multiple schemes is not the only way to show continuity (see: 18 USCA, Sections 1961(5), 1962; also, see: *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), 109 S. Ct. 2893, 106 L. Ed. 2d 195, on remand 734 F. Supp. 879, affirmed 954 F.2d 485, certiorari denied 504 U.S. 957, 112 S. Ct. 2306, 119 L. Ed. 2d 228).

10. "Continuity" is sufficiently established for purposes of a RICO pattern, where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes; such associations include, but extend well beyond those traditionally grouped under the phrase "organized crime" (see: 18 USCA, Sections 1961(5), 1962; also, see: *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), 109 S. Ct. 2893, 106 L. Ed. 2d 195, on remand 734 F. Supp. 879, affirmed 954 F.2d 485, certiorari denied 504 U.S. 957, 112 S. Ct. 2306, 119 L. Ed. 2d 228).

11. The "continuity" requirement of a RICO pattern is satisfied where it is shown that predicates are a regular way of conducting defendant's ongoing legitimate business, or of conducting or participating in an ongoing and illegitimate RICO "enterprise" (see: 18 USCA, Sections 1961(5), 1962; also, see: *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), 109 S. Ct. 2893, 106 L. Ed. 2d 195, on remand 734 F. Supp. 879, affirmed 954 F.2d 485, certiorari denied 504 U.S. 957, 112 S. Ct. 2306, 119 L. Ed. 2d 228).

12. The term "enterprise" as used in Racketeering Influenced and Corrupt Organizations (RICO) Act encompasses both legitimate and illegitimate enterprises, since, though its major purpose was to protect legitimate business enterprises from infiltration by racketeers, it also made criminal participation in an association which performs only illegal acts and which has not infiltrated or attempted to infiltrate legitimate enterprise (see: 18 USCA, Section 1961(4); also, see: *United States v. Turkette*, 452 U.S. 576 (1981), 101 S. Ct. 2524, 69 L. Ed. 2d 246, on remand 656 F. 2d 5).

13. The enterprise may be "operated" or "managed" within meaning of Federal RICO statute, by those not employed by enterprise, but who exert control over it as, for

example, by bribery (see: 18 USCA, Section 1962(c); also, see: *Reves v. Ernst & Young*, 507 U.S. 170 (1993), 113 S. Ct. 1163, 122 L. Ed. 2d 525).

14.  RICO liability is not limited to those with primary responsibility for the enterprise's affairs, with formal positions in the enterprise, or with significant control over or within the enterprise. Liability under RICO statute prohibiting the conduct of the enterprise's affairs through a "pattern of racketeering activity" is not limited to upper management, <u>but may extend to lower-rung participants in the enterprise who are under direction of upper management</u> (see: 18 USCA, Section 1962(c); also, see: *Reves v. Ernst & Young*, 507 U.S. 170 (1993), 113 S. Ct. 1163, 122 L. Ed. 2d 525).

15.  Predicate acts **need not** be established beyond a reasonable doubt in a private treble damages action under Racketeering Influenced and Corrupt Organizations Act; the fact that offending conduct is described by reference to criminal statutes does not mean that its occurrence must be established by criminal standards or that the consequences of a finding of civil liability in a private civil action are identical to the consequences of a criminal conviction (see: 18 USCA, Sections 1962, 1964(c); also, see: *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985), 105 S. Ct. 3275, 87 L. Ed. 2d 346, dissenting opinion 473 U.S. 479, 105 S. Ct. 3292, 87 L. Ed. 2d 346).

///

## Savings to Suitor Clause Invoked – Title 28 U.S.C.  Sec. 1333(1)

16.  The Petitioners hereby give Notice that they invoke the **Savings to Suitor Clause**, 28 U.S.C. Sec. 1333(1), in order to proceed in the course of the common Law, as the instant private commercial Matter is a Controversy within the special maritime and territorial jurisdiction of the United States.

17.  The Fifth, Sixth, Seventh, and Ninth Amendments of the Constitution of the United States secure Due Process in the course of the Common Law for the People of these united States of America, which necessarily includes a common law **Trial by Jury**, by twelve Peers (see: *e.g., Wayman v. Southard*, 23 U.S. 1 (1825), 6 L. Ed. 253, 10 Wheaton 1).

Amended Petition and Complaint for Civil Damages, *inter alia*

18.    Under the Rules of Common Law Procedure, acquiescence to stipulations of Fact and Law set forth in attending law, claim, or complaint affidavits, along with conclusions of law, included or incorporated by reference, either by acceptance, protest, or rebuttal documents, will have the effect of a common law agreement by tacit procuration, whether for purposes of administrative or judicial Due Process remedies. In the event of Acquiescence or Stipulation secured by tacit procuration, such Acquiescence or Stipulation may constitute the basis for additional Remedies.

## Judiciary Act of September 24, 1789, Sec. 32, First Congress, Session 1, Ch. 20, A. D. 1789

19.    "And be it further enacted that no summons, writ, petition, declaration, return, process, judgment, or other proceedings in civil cases in any of the courts of the United States, shall be abated, arrested, quashed or reversed, for any defect or want of form, but the said courts respectively shall proceed and give judgment according as the right of the cause and matter in law shall appear unto them, without regarding any imperfections, defects or want of form in such writ, petition, declaration, or other pleading, returns process, judgment, or course of proceeding whatsoever, except those only in cases of demurrer, which the party demurring shall specially sit down and express together with his demurrer as the cause thereof. And the said courts respectively shall and may, by virtue of this act, from time to time, amend all and every such imperfections, defects and wants of form, other than those only which the party demurring shall express as aforesaid, and may at any time, permit either of the parties to amend any defect in the process of pleadings upon such conditions as the said courts respectively shall in their discretion, and by their rules prescribe ..."

///

### Part II: Subject Matter Jurisdictional Statement

20. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. Sec. 1331 in that the claims alleged therein arise under the laws and constitution of the United States. Furthermore, there is diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332 because there is complete diversity of political status [citizenship] between the Parties.

21. The court also has subject matter jurisdiction to consider this Complaint under authority of 18 U.S.C. Section 1964(a) and (c) and by virtue of sufficient pleadings clearly articulating violations of federal criminal offenses, including offenses occurring under 18 U.S.C. Sections 2, 3, 4, 241, 1341, 1343, 1346, 1956-1964 et seq.; 12 USC Sec. 2601 et seq.; and 15 U.S.C. Sections 1601 et seq., 1639 et seq., 1692 et seq.

22. This court has supplemental jurisdiction pursuant to 28 U.S.C. Sec. 1367 to hear and determine Petitioners' state law claims because those claims are related to Petitioners' federal claims and arise out of a common nucleus of related facts and form part of the same case or controversy under Article III of the Constitution of the United States.

///

### Part III: Statement of Venue

23. Venue is appropriate in the Federal District of Oregon as the violations of 18 U.S.C. Sections 3, 4, 241, 1341, 1343, 1346, 1956-1964 et seq.; 12 USC Sec. 2601 et seq.; and 15 U.S.C. Sections 1601 et seq., 1639 et seq., 1692 et seq. complained of were initiated or occurred in part within the territorial confines of the Federal District of Oregon.

///

### Part IV: Parties to Action

24. Petitioners **Larry-Denton** and **Kathleen-Harrison** [Family: Smith], man and wife, are two of the American People living lawfully and peacefully in Jackson county, Oregon, hereinafter "Petitioners". The Petitioners are the current lawful owners of the private land and principal dwelling house commonly known **2036 Pleasant Creek Road**, situate in Jackson county, Oregon, United States of America, which is allegedly security for the (promissory) "NOTE" dated "November 18, 2004".

25. Defendant U.S. BANK, N.A. (hereinafter "Defendant U.S. BANK"), a division or wholly owned subsidiary of U.S. BANKCORP, acts as a "residential mortgage lender" that allegedly provides residential home loans to consumers, as well as providing "Corporate Trust Services" for a multitude of financial entities.

Amended Petition and Complaint for Civil Damages, *inter alia*

Defendant U.S. BANK operates in interstate commerce and routinely does business in Oregon.  Defendant U.S. BANK accepts process in the instant commercial Matter through its attorney of record, J. Owen Campbell, of the law firm of HOUSER & ALLISON, P.C., which is located at 9970 Research Drive [92618], in Irvine, California.

26. Defendant **Richard K. Davis**, *in esse*, (hereinafter "Defendant Davis), individually, and as President, Chief Executive Officer, and Chairman of the Board of Defendant U.S. BANK, accepts process at U.S. BANKCORP  headquarters, which is located at 800 Nicollet Mall [55402], in Minneapolis, Minnesota.

27. Defendant **Michelle Moeller**, *in esse*, (hereinafter "Defendant Moeller), individually, and as Vice President of Defendant U.S. BANK's Corporate Trust Services, accepts process at Defendant U.S. BANK's Corporate Trust Services office, which is located at EP-MN-WS3D, 60 Livingston Avenue [55107-2292], in Saint Paul, Minnesota.

28. Defendant SAXON MORTGAGE SERVICES, INC. (hereinafter "Defendant SAXON"), is acting as the agent of Defendant U.S. BANK in the instant commercial matter, allegedly as the primary "loan servicer", with alleged written authority from the duly authorized live agent(s) Defendant U.S. BANK to collect payments on Petitioners' "NOTE".  Defendant SAXON accepts process through its President David L. Dill, at its corporate offices located at 4708 Mercantile Drive North, [76137] or Post Office Box 161489 [76161], in Forth Worth, Texas.

29. Defendant **David L. Dill** (hereinafter "Defendant Dill"), individually, and as President of Defendant SAXON, accepts process at Defendant SAXON's corporate offices located at 4708 Mercantile Drive North [76137] or Post Office Box 161489 [76161], in Forth Worth, Texas.

30. Defendant **Robin Chrostowaski** (hereinafter "Defendant Chrostowaski"), individually, and as Assistant Vice President of Defendant SAXON, accepts process at Defendant SAXON's corporate offices located at 4708 Mercantile Drive North [76137], in Forth Worth, Texas.

31. Defendant NEW CENTURY MORTGAGE CORPORATION (hereinafter "Defendant NEW CENTURY MORTGAGE"), subsidiary of NEW CENTURY FINANCIAL CORPORATION is named as a <u>nominal</u> defendant in this Complaint due to the material fact that both Defendant NEW CENTURY MORTGAGE and its parent corporation are both bankrupt and defunct California corporations. Defendant NEW CENTURY MORTGAGE is shown as the original "Lender" on the "NOTE" and DEED OF TRUST" (see annexed **Exhibits A** and **B**) which is the alleged basis of Defendant U.S. BANK's claim and its agents' on-going actions for attempting to obtain money from the Petitioners. **Please Note:** The name and corporate logo of "NEW CENTURY MORTGAGE" were sold as assets by the U. S. Bankruptcy Trustee and are currently owned and in use by a different corporate entity, which **is not** intended by the Petitioners to be named as a defendant in this Amended Petition and Complaint.

32. Defendant **Brad A. Morrice**, *in esse*, (hereinafter "Defendant Morrice"), individually, and as former President and Chief Executive Officer of Defendant NEW CENTURY MORTGAGE, accepts process at c/o BAMOR Consulting Services LLC, 2485 Irvine Cove Crescent [92651-1037], Laguna Beach, California.

33. Defendant **Patti M. Dodge**, *in esse*, (hereinafter "Defendant Dodge"), individually, and as former Chief Financial Officer of Defendant NEW CENTURY MORTGAGE, accepts process at 26 Orville [92602], Irvine, California.

34. Defendant **Logan Rutherford**, *in esse*, (hereinafter "Defendant Rutherford"), individually, and as former Loan Officer/Interviewer of Defendant NEW CENTURY MORTGAGE, accepts process at 5000 Southwest Meadows Road, Suite 440 [97035], Lake Oswego, Oregon.

35. Defendant OCWEN LOAN SERVICING, LLC (hereinafter "Defendant OCWEN"), is acting as the agent of Defendant U.S. BANK in the instant commercial matter, allegedly as a "sub servicer", with alleged written authority from the duly authorized live agent(s) Defendant SAXON to collect payments on Petitioners' "NOTE". Defendant OCWEN accepts process through its President Ronald M. Faris, at its

corporate offices located at 1661 Worthington Road, Suite 100 [33409], in West Palm Beach, Florida.

36. Defendant **Ronald M. Faris**, *in esse*, (hereinafter "Defendant Faris"), individually, and as President of Defendant OCWEN, accepts process at Defendant OCWEN's corporate offices located at 1661 Worthington Road, Suite 100 [33409], in West Palm Beach, Florida.

37. Defendant **Christina Carter**, *in esse*, (hereinafter "Defendant Carter"), individually, and as Account Management Manager for Defendant OCWEN, accepts process at Defendant OCWEN's corporate offices located at 1661 Worthington Road, Suite 100 [33409], in West Palm Beach, Florida.

38. Defendants JOHN and JANE DOES 1-500 are either unknown RICO predicate actors who have conspired with and/or aided and abetted the named Defendants herein; or separately are persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in either the private land or chattel property described in the Complaint adverse to Petitioners' title or any cloud on Petitioners' title thereto", hereinafter sometimes referred to as the unknown defendants, as they are unknown to Petitioners. These unknown defendants and each of them claim some right, title, estate, lien, or interest in the hereinafter-described property adverse to Petitioners' title, unknown to Petitioners, and their claims, and each of them, constitute a cloud of the Petitioners' title to said private land or dwelling house.

///

## Part V: Amended Petition and Complaint for Civil Damages and Quiet Title

39. **Come Now:** The Petitioners, with their Amended Petition and Complaint for Civil Damages under authority of the Home Ownership Equity Protection Act ("HOEPA"), 15 USC Sec. 1639 et seq.; Real Estate Settlement Procedures Act ("RESPA"), 12 USC Sec. 2601 et seq.; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. Sec. 1692 et seq.; the Truth in Lending Act ("TILA"), 15 U.S.C. Sec. 1601 et seq. (Regulation Z, 12 C.F.R. Part 226 et seq.); and civil RICO damages under 18 U.S.C. Section 1964(a) and (c), complaining for declaratory judgment in respect of the same, and demanding damages arising from fraud in the inducement, mortgage fraud, mail fraud, wire fraud, securities fraud, unlawful debt collection,

and slander of title inflicted by the live agents of the named corporate Defendants, all relating to the Petitioners' private land and dwelling house commonly known as **2036 Pleasant Creek Road**, in the community of Rogue River, within the surveyed geographical boundaries of Jackson county, Oregon.

///

## Nature of the Complaint

40. This Amended Petition and Complaint for damages, declaratory, and other relief, is the result of the removal of the Petitioners' <u>Petition for Verification of Debt, or in the Alternative Lawful Demand for Release of Claim</u> by Defendant U.S. BANK's attorney from the state trial court to this honorable Court; and, arises out of the named party Defendants' egregious and ongoing and far reaching fraudulent schemes for improper use of the Petitioners' identity, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations as Mortgagee or "Trustee" on the "DEED OF TRUST", "Mortgage Brokers," "Loan Originators," "Loan Seller", "Mortgage Aggregator," "Trustee of Pooled Assets", "Trustee or officers of Structured Investment Vehicle", "Investment Banker", "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-backed Certificates'", "Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans pooled together in a trust fund.

41. The named Defendants as participants in the securitization scheme described herein have devised business plans to reap billions of dollars in profits at the expense of alleged borrowers, such as the Petitioners in the instant case, as well as an unknown number of investors in certain trust funds.

42. In the aforementioned removed state court action (*i.e.,* Jackson County Circuit Court Case Number: 103372Z3) the Petitioners were only seeking verified proof that Defendant U.S. Bank (as alleged Trustee) was in fact the holder or holder-in-due-course of the  Petitioners' original "wet ink" Promissory Note and the Petitioners were not seeking damages or adjudication  of the material facts relating to Defendant U.S. Bank's claim that it or its alleged principal was the lawful holder or holder-in-due-course of the aforesaid Promissory Note.

43. Due to Defendant U.S. Bank's removal of the aforesaid state court action to this honorable Court, the Petitioners are hereby amending their Petition to seek proper adjudication of the material facts relating to Defendant U.S. Bank's claim that it or its alleged principal is the lawful holder or holder-in-due-course of the aforesaid Promissory Note, as well as, compensatory, consequential and other damages caused to the Petitioners by the live agents of the named corporate Defendants violation of multiple Federal and State laws.

44. In addition to seeking compensatory, consequential and other damages, Petitioners seek declaratory relief as to what (if any) party, entity or individual or group thereof is the owner of the Petitioners' Promissory Note (see: annexed **Exhibit A**) executed at the time of the loan closing, and whether the Deed of Trust, *i.e.*, Security Agreement (see: annexed **Exhibit B**), secures any alleged obligation of the Petitioners to Defendant U.S. Bank, and a **mandatory Injunction** requiring reconveyance of the subject Property to the Petitioners or, in the alternative a Final Judgment granting the Petitioners Quiet Title in the subject property.

///

### Summary of Material Facts of this Case

45. The Petitioners are the nominal payors on the subject (promissory) "NOTE" at issue. The loan seller, *i.e.*, Defendant NEW CENTURY MORTGAGE, was a financial institution that was paid a fee to pose as a residential mortgage lender, when in fact the source of loan funds and the actual lender (investors in Certificates) and underwriter (Mortgage Aggregator and Investment Banker) were other parties whose identities and receipt of fees and profits were withheld from the Petitioners at close of escrow and despite numerous requests continue to be withheld from the Petitioners by the live agents of Defendants U.S. BANK, SAXON and OCWEN contrary to the requirements of Federal Law and applicable Oregon State law.

46. Unknown to the Petitioners, the loan seller, acting as principal in its relationships with the "independent appraiser" of the property and the mortgage broker and mortgage originator, induced the Plaintiff into a transaction that did not and could not meet normal underwriting standards for a residential mortgage. The loan

seller posed as a conventional mortgage lender thus leading Plaintiff to reasonably believe that the loan seller, the mortgage broker, and the loan originator had an interest in the success (repayment of the loan) of the transaction that the Petitioners were induced to believe was being executed at the time of the "closing" of the subject loan transaction.

47. In fact, the loan seller, mortgage broker, appraiser, loan originator, title agent, escrow agent and the "Trustee" (*i.e.,* "FIRST AMERICAN TITLE") on the "DEED OF TRUST", had no financial stake (*i.e.,* liability) in the transaction and no interest other than obtaining Petitioners' signatures on a "loan" that could never be repaid, contrary to representations and assurances from the conspiring participants in this **fraudulent scheme**.

48. In fact, the "Appraisal" was intentionally and knowingly inflated along with other loan data to justify the closing of the "loan transaction". Petitioners relied upon the due diligence of the apparent "Lender" (*i.e.,* actually the loan seller) in executing and accepting the closing documents.

49. Under Oregon law, as defined both by common law judicial precedent and statute, a contract requires a promise which is bargained for as consideration, but the contract will only be valid if the promised performance would be consideration.

50. The November 18, A. D. 2004, "NOTE" and "DEED OF TRUST" between the Petitioners and Defendant NEW CENTURY MORTGAGE is unenforceable and void as there are **no promises** constituting consideration made or intended by Defendant NEW CENTURY MORTGAGE, to the alleged Borrowers. The alleged original "Lender" NEW CENTURY MORTGAGE (somehow the mysteriously disconnected predecessor in interest to Defendant U.S. BANK) did not even promise to make lend money, or recite that it had ever delivered money to the Plaintiffs (see annexed **Exhibits A** and **B**).

51. A promise or apparent promise is not consideration if, by its terms, the promisor or purported promisor reserves a choice or alternative performances. Words of promise which by their terms make performance entirely optional with the promisor do not constitute a promise.

52. Where the apparent assurance of performance is illusory, it is not consideration for the return promise. An "agreement to do or not to do a certain thing" which requires mutual promises of detrimental undertaking between at least two parties; the detrimental undertakings are the bargained for exchange known as "consideration." *Office Pavilion S. Fla., Inc. v. ASAL Prods., Inc.,* 849 So. 2d 367 (Fla. 4th DCA May 21, 2003).

53. Defendant NEW CENTURY MORTGAGE did not promise to loan anything to the Petitioners. Accordingly, even if there IS privity of contract between Defendant U.S. BANK or its alleged principal, and the Petitioners, which the Petitioners categorically **deny**, based on the evidence in **Exhibits A** and **B**, there is no enforceable contract because there was no **bargained for** consideration or detrimental promises which would constitute the same.

54. Thus no bank or other financial institution actually performing under the standards, rules and regulations governing such institutions was the "lender" which is the basis for the Petitioners' cause of action for **usury**, to wit: that the inflated appraisal added an undisclosed cost to the loan which when added to the other terms, disclosed and undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the State legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and mislead the Petitioners as to the real parties in interest and the fees generated by the production of the subject "loan transaction."

55. The named Defendants' purpose was solely to collect fees, rebates, kickbacks and profits that were never disclosed to the Petitioners and have only recently been discovered by the Petitioners through consultation with an expert in securitization of residential mortgage loans (see: annexed **Exhibit C** – certified copy of the "EXPERT DECLARATION OF NEIL FRANKLIN GARFIELD, ESQ"), and diligent research including the filings of some parties with the Securities and Exchange Commission which disclose the normal manner of operating this **fraudulent scheme**.

Amended Petition and Complaint for Civil Damages, *inter alia*

56. The loan seller was named as the Payee on the subject (promissory) "NOTE" and the beneficiary under the mortgage terms allegedly securing the performance under the subject note. The Title Company, *i.e.*, "FIRST AMERICAN TITLE", was named as the "Trustee" on the "DEED OF TRUST" executed at the time of the alleged "closing" of the "loan transaction." In accordance with Oregon State law, the "DEED OF TRUST" and terms of security was recorded in the Jackson county records.

57. Notwithstanding the above, and <u>without</u> the knowledge of the Petitioners, the loan seller had entered into Assignment and Assumption Agreements with one or more parties and Pooling and Service Agreements with one or more parties including but not limited to the mortgage aggregator prior to or contemporaneously with the "closing" of the subject "loan transaction."

58. Under the terms of these agreements, the loan seller received a sum of money, usually on receiving an application for a loan equal to the gross amount of the loan sought by Plaintiff plus a fee of 2.5% or more which was allocated to the subject loan transaction.

59. Contrary to the documents presented before and during the "closing" of the "loan transaction" the loan seller was neither the source of funding nor the "Lender." Thus at the time of recording, the source of funding and the "Lender" was a different entity than the nominal mortgagee or beneficiary under the "DEED OF TRUST" and was neither named nor disclosed in any fashion.

60. The security for the "loan" thus secured an obligation that had been **paid-in-full** by a third party. Said third party(ies) was acting as a financial institution or "Lender" without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of the State of Oregon and/or Federal authorities and/or agencies.

61. Some form of documentation represented by the loan seller to the Mortgage Aggregator was presented before or contemporaneously with the "closing" of the loan" transaction. In some cases the documentation included actual copies of the documents presented at "closing." In most cases it consisted of either forged blank

Notes, copies of the Notes <u>certified by title company employees at close of escrow,</u> or vague descriptions of the content of the Notes that were placed into the pool of assets that would be "securitized."

62.   The Petitioners have discovered numerous cases in which the "loan closing" either did not take place at all or included documentation substantially different than the original offer and acceptance and substantially different than what could have been reported to the Mortgage Aggregator prior to the "closing."  The Petitioners have also discovered numerous cases in which foreclosure has proceeded despite the fact that no loan closing was ever consummated, no papers were ever signed, **or the loans were properly rescinded under Federal law**.

63.   The Petitioners do not know what version of documentation that was presented to the Mortgage Aggregator and if the Mortgage Aggregator took one or more varying descriptions of the alleged "loan documents" into more than one pool of assets which was eventually sold for the purpose of securitizing the assets of the pool which included the subject loan transaction either once or more than once. Petitioners have requested such information numerous times only to be met with complete silence from the Defendants.  Finally, on October 30, A. D. 2009, a live agent of Defendant SAXON provided the Petitioners with the purported true name of the securitized pool the Petitioners' original "NOTE" was sold into and is allegedly being held in Trust by Defendant U.S. Bank.

64.   There is no assignment of the subject "DEED OF TRUST" in the Jackson county records to Defendant U.S. Bank or its alleged principal, however on October 4, A.D. 2010, a live agent of Defendant OCWEN sent the Petitioners a non-recorded and <u>obviously</u> **bogus** "ASSIGNMENT OF DEED OF TRUST OREGON" allegedly **from** Defendant OCWEN **to** Defendant U.S. Bank dated "SEPTEMBER 28, 2010" and purportedly <u>retroactive</u> to the "16TH DAY OF NOVEMBER, 2009", signed before Florida Notary Public **Elsie Ramirez** (Commission #DD914835) by Defendant Carter (see: annexed **Exhibit C**).

65.   The Petitioners are aware there is a non-recorded "Pooling and Services" Agreement and a non-recorded Assignment and Assumption Agreement, which

appears to substitute the Trustee over the pooled assets for the nominal Trustee in the "DEED OF TRUST". The powers of this second Trustee were in turn transferred to either a Trustee for a Special Investment Vehicle (which performed the accounting and reporting of the pool assets) or to an investment bank Collateral Debt Obligation manager whose department performed the accounting and reporting of the pool assets. The reporting of the pool assets consisted principally of descriptions of the notes "signed" by borrowers and limited descriptions of the general terms of the note such that the note appeared to be more valuable than the initial terms of payment by the "borrower."

66.  The NOTE from the subject "loan transaction" was eventually allocated into a new corporate entity (Special Purpose Vehicle) formed for the express purpose of holding the pooled assets under certain terms.  The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated "loan transactions" contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees associated with only that specific "loan transaction."

67.  Whether such "deficiency" was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the "borrower" is not known, despite numerous requests for accounting and the refusal of Defendants to provide any such information.

68.  The Investment Banking firm arranged through payment for a false inflated appraisal of the certificates and/or issuer of the certificates that would be sold to investors in much the same way as it had procured the false appraisal of the property that "secured" the "loan transaction."

69.  In addition, insurance was purchased from proceeds of this transaction, credit default swaps were purchased from proceeds of this transaction, the investors investments were "oversold" to create a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created cross-collateralization agreements and over-collateralization of the pool assets to assure payments to the investors,

thus creating co-obligors on the payment stream due from the Petitioners on the subject "loan transaction."

70. The pool assets, including the Petitioners' subject "loan transaction" "were pledged completely" to the owners of the "asset-backed securities." All the certificates were then transferred to a "seller" who in turn sold the certificates in varying denominations, each of which had slightly different terms depending upon which segment of the pool (tranche) secured the investment.

71. Each transaction can be identified by a CUSIP number that may be used to track the buying, selling or trading of the CUSIP group at any time. This 9-character alphanumeric code identifies any North American security for the purposes of facilitating clearing and settlement of trades. The CUSIP Service Bureau acts as the National Numbering Association (NNA) for North America, and the CUSIP serves as the National Securities Identification Number for products issued from both the United States and Canada. In the instant commercial Matter, there are at least two unique CUSIP numbers that were assigned to the "loan transaction" at issue.

72. If there is a holder-in-due-course of the Petitioners' Note arising from the subject "loan transaction" it is the investors who purchased said securities (certificates).

73. Some of said securities are held by the original purchaser thereof, others were sold at weekly auction markets, others were paid by re-sales of property that was "secured", others were paid from prepayments, others were paid by sale at full or partial price to the investment bank that originated the entire transaction, some of which might be held by the Federal Reserve as non-recourse collateral, and others might have been paid by one or more of the insurance, credit default swaps, cross guarantees or cross collateralization of the segment of the pool that secured the relevant investor who owned certificates backed by a pool of assets that included the subject "loan transaction."

74. It is doubtful that any of the live agents of Defendants U.S. BANK, SAXON, or OCWEN have any knowledge or have made any effort to determine whether the putative holders-in-due-course have been paid in whole or in part.

75. It can only be said with certainty that the live agents of Defendants U.S. BANK, SAXON, and OCWEN seek to enforce loan documents for which they have **already been paid-in-full** plus illegal fees for participating in an illegal scheme.

76. Defendants U.S. BANK, SAXON, and OCWEN seek to add insult to injury by demanding payment for a promissory Note, which they have **no standing** to enforce.

77. In order for Defendants U.S. BANK, SAXON, or OCWEN to maintain legal standing in connection with the subject loan transaction they are **required** to show the entire chain of title of the "NOTE" and the entire chain of title of the "DEED OF TRUST".  They have refused to do this despite numerous requests, leading Petitioners to conclude that the Defendants **cannot produce** such evidence of a complete chain of title or are intentionally withholding the information that would show breaks in such chain.

78. The Petitioners are left in the position of being in an adversary proceeding with legal ghosts.  While Defendant NEW CENTURY MORTGAGE is legally "dead", the fact remains that any relief awarded Defendants U.S. BANK, SAXON, or OCWEN, any standing allowed to the aforesaid corporate Defendants would expose the Petitioners to multiple claims and suits from an unknown number of parties and entities that all claim, possibly correctly, to the real holders-in-due-course.

79. Additionally, any grant of a certificate of title to an entity other than Petitioners creates an incurable defect in title.

80. There is no recording of any document in the Jackson county records which show Defendants U.S. BANK, SAXON, or OCWEN have any interest in the Petitioners' original (promissory) "NOTE" or which would authorize them to lawfully proceed to enforce payment of said "NOTE".

///

### Significance of REMIC in the Instant Case

81. Mortgage backed Securities (MBS) Certificates are "pass through Certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment

Conduit ("REMIC") to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G.

82.  REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions which it may not undertake (i.e. "prohibited transactions").  **Any** violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificate holders. For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%. The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the Trust and the Certificate holders for the entire amount of the tax.

83.  Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.  A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date, (2) was purchased by the REMIC Trust within 3 months after the startup date or (3) any qualified replacement mortgage.

84.  Permitted investments for a REMIC trust are limited to:

    a. Cash Flow Investments (i.e. temporary investment where the Trust holds money it has received from qualified mortgages pending distribution to the Certificate holders);

    b. Qualified Reserve Assets (i.e. any *intangible* property which is held for investment and is part of a reasonably required reserve to provide for full payment of expenses of the REMIC or amounts due on regular interests in the event of defaults on qualified mortgages or lower than expected returns on cash flow investments. These investments are for very defined purposes and are to be passive in nature. They must be "reasonably required."

    c. Liquidation Proceeds from "foreclosed property" which is acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust. In order to maintain the REMIC status, the Trustee and the "servicers" must ensure that the REMIC receives no income from any asset that is not a "qualified mortgage" or a "permitted investment." 26 U.S.C. § 806F(a)(2)(B).

85. Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a Qualified Mortgage or a Permitted Investment. 26 U.S.C. Sec. 860F(a)(2)(B). Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. Sec. 860F(a)(1).

86. Contributions of any "property" – *e.g.*, cash, mortgages, etc. – made to the REMIC are taxed at 100% of the contribution, except for the four following exceptions:

    a. Contributions to facilitate a "clean up call" (i.e. the redemption of a class of regular interest, when by reason of prior payments with respect to those interests the administrative costs associated with servicing that class outweigh the benefits of maintaining the class). Reg. § 1.860G-2(j)(1).

    b. Any cash payment in the nature of a guarantee, such as payments to the REMIC Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest. These taxes and penalties are ultimately borne by the Certificate holders under a surety bond, letter of credit or insurance policy.

    c. Any cash contribution during the three month period after the start-up day; and,

    d. Any cash contribution to a qualified reserve fund made by a holder of a residual interest.

87. On a monthly basis, the Investment Banking firm and/or its agents, servants or employees compiled, individually and in concert, oversaw and approved all the information contained in the Distribution Reports and electronically sent same to certain parties. The data regarding the number of bankruptcies, aggregate Special Servicing Fees, and aggregate Trust Fund Expenses was routinely incomplete, false, and/or misleading.

88. The Distribution Reports are supposed to accurately reflect the "financial health of the trust," and provide Certificate holders, with important data such as the number of loans in bankruptcy, the aggregate amount of special servicing fees, and the aggregate amounts of trust fund expenses. Each and every one of these categories

is essential for to assess its profit and loss potential in the REMIC entity. Furthermore, this data is used by bond rating agencies to assess the value of the Certificates.

89.  Based upon the filings and information of the Petitioners it appears that no accurate accounting has ever been presented to anyone and that therefore the identity and status of any putative holder-in-due-course is completely shrouded in secrecy enforced by the named corporate Defendants, their live agents, servants and employees.

90.  Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to Borrowers where the repurchase was, as is usually the case, far less than the original investment. While the Petitioners would never have entered into a transaction if the true nature of this scheme had been revealed, any profits, refunds, rebates, fees, points, costs or other income or gain should be credited on some basis to said borrowers including the Petitioners herein.

91.  The end result of the false and misleading representations and material omissions by the live agents of Defendant New Century Mortgage as to the true nature of the mortgage loan actually being processed, which said live agents of Defendant New Century Mortgage had actual knowledge was in direct conflict with the original Uniform Residential Loan Application, early TILA, and Petitioners' stated intentions and directions to the live agents of Defendant New Century Mortgage at the time of original application for the loan, fraudulently caused Petitioners to execute predatory loan documents.

92.  At no time whatsoever did the live agents of Defendant New Century Mortgage ever advise Petitioners that:

      (a)  that the originating "lender", *i.e.,* Defendant New Century Mortgage, had no intention of retaining ownership interest in the mortgage loan or fully servicing same and in fact may have already pre-sold the loan, prior to closing, to a third party mortgage aggregator;

          Amended Petition and Complaint for Civil Damages, *inter alia*

(b) that the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers (including but not limited to Defendants DOES 1-500), for the ultimate purpose of bundling the Petitioners' mortgage loan with hundreds or perhaps thousands of others as part of a companion, support, or other tranche in connection with the creation of a REMIC security known as a Collateralized Mortgage Obligation ("CMO"), also known as a "mortgage-backed security" to be sold by a securities firm (and which in fact ended up as collateral for Asset-Backed Securities Certificates, created within a few months of the closing);

(c) that the "DEED OF TRUST" and the "NOTE" would be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the "NOTE" would not be in privity with or have the legal right to foreclose in the event of default;

(i) that in connection with the multiple downline resale and assignment of the mortgage and Promissory Note that assignees or purchasers of the Note may make "paydowns" against the Note which may effect the true amount owed by the Petitioners on the "NOTE";

(j) that a successive assignee or purchaser of the "NOTE" and "DEED OF TRUST" may not, upon assignment or purchase, unilaterally impose property insurance requirements different from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without the Petitioners' prior notice and consent.

93. As a result of the closing and in connection therewith, the live agents of Defendant NEW CENTURY MORTGAGE placed the Petitioners into a sub-prime fixed rate mortgage program, with Defendants intentionally misleading Petitioners and engaging in **material omissions** by failing to disclose to Petitioners of the material fact that the nature of the mortgage loan application had been materially changed without the Petitioners' knowledge or consent and that Petitioners were being placed into an fixed rate mortgage program despite not being fully qualified for such a program.

94. Prior to the closing the agents of Defendant New Century Mortgage failed to provide to Petitioners the <u>accurate</u> preliminary disclosures required by the Truth-In-Lending Act pursuant to 12 CFR Sec. 226.17 and 18 (also known as and referred to herein as "Regulation Z"), and failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24 CFR Sec. 3500.6 and 35007, otherwise known as the GFE.

95. The live agents of Defendant New Century Mortgage also intentionally failed and/or refused to provide Petitioners with various disclosures which would indicate to the Petitioners that the consumer credit contract entered into was void, illegal, and predatory in nature due in part to the fact that the final TILA showed a "fixed rate" schedule of payments, but did not provide the proper disclosures of the actual contractually-due amounts and rates.

96. The live agents of Defendant New Century Mortgage failed and/or refused to provide an <u>accurate</u> HUD-1 Settlement Statement at the closing which reflected the true cost of the consumer credit transaction. As Defendants failed to provide an accurate GFE or Itemization of Amount Financed ("**IOAF**"), there was no disclosure of a Yield Spread Premium ("**YSP**"), which is required to be disclosed by the Truth-In-Lending Act) and thus **no disclosure** of the true cost of the loan.

97. As a direct and proximate result of these failures to disclose as required by the Truth-In–Lending Act, Defendant New Century Mortgage received a YSP in a substantial amount of without preliminary disclosure, which is a *per se* violation of 12 CFR Sec. 226.4(a), 226.17 and 18(d) and (c)(1)(iii). The YSP raised the interest rate which was completely unknown to or approved by the Petitioners, as they did not received the required GFE or IOAF.

98. In addition, the completely undisclosed YSP was not disclosed by Defendant in their broker contract, which contract was blank in the area as to fees to be paid to Defendant New Century Mortgage. This is an illegal kickback in violation of 12 USC Sec. 2607 as well as State law which gives rise to all damages claims for all combined broker fees, costs, and attorneys' fees.

99. The Amount Financed within the TILA is also <u>understated</u> which is a **material violation** of 12 CFR Sec. 226.17 and 18, in addition to 15 USC Sec. 1602(u), as the Amount Financed <u>must</u> be completely accurate with no tolerance.

100. The live agents of Defendant New Century Mortgage were under numerous legal obligations as fiduciaries and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper, and that Petitioners received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after the closing.

101. The Petitioners, not being in the consumer lending business, mortgage brokerage business, or residential loan business, reasonably relied upon the live agents of Defendant New Century Mortgage to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and regulations.

102. At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four (4) installments and was initially payable to the person the subject of the transaction, rendering Defendants "creditors" within the meaning of the Truth-In-Lending Act, 15 U.S.C. Sec. 1602(f) and Regulation Z Sec. 226.2 (a)(17).

103. At the closing of the subject "loan transaction", Petitioners executed a (promissory) "NOTE" and "DEED OF TRUST" ("Security Instrument") in favor of Defendant New Century Mortgage as aforesaid. This transaction, designated by the live agents of Defendant New Century Mortgage as a "Loan", extended consumer credit which was subject to a finance charge and which was initially payable to the Defendants. As part of the consumer credit transaction the subject of the closing, Defendant New Century Mortgage retained a security interest in the subject Property which is the Petitioners' principal dwelling home.

104. All named Defendants engaged in a pattern and practice of defrauding Petitioners in that, during the entire life of the subject mortgage loan, Defendants failed to properly credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees. At all times material, all the live agents of

the named corporate Defendants had actual knowledge (or the means to know) that the Petitioners' accounts were not accurate but that the Petitioners would make further payments based on corporate Defendants' inaccurate accounts and billing statements.

105. The Petitioners made payments based on the improper, inaccurate, and fraudulent representations by the live agents of the named corporate Defendants as to Petitioners' account; and as a direct and proximate result of the actions of the Defendants set forth above, Petitioners overpaid in interest.

106. The live agents of the named corporate Defendants also utilized amounts known to said live agents to be inaccurate to determine the amount allegedly due and owing to the NOTE holder. Defendants' violations were all material in nature under the Truth-In-Lending Act.

107. Said violations, in addition to the fact that the Petitioners did not properly receive Notices of Right to Cancel due to fraud and misrepresentation by the live agents of Defendant New Century Mortgage, which constitute violations of 15 USC Sec. 1635(a) and (b) and 12 CFR Sec. 226.23(b), and are thus a legal basis for and legally extend the Petitioners' right to exercise the remedy of rescission.

108. Defendants assigned the "NOTE" and "DEED OF TRUST" to parties who did not take these instruments in good faith or without notice that the instruments were invalid or that pursuant to the Oregon Commercial Code (*i.e.*, **ORS 73.0305**) the Petitioners had defenses and claims in recoupment.

109. Additionally, pursuant to **ORS 73.0302**, neither Defendant U.S. BANK nor its alleged principal is the current holder or holder-in-due-course of the Petitioners' original wet ink "NOTE" and are thus liable to the Petitioners, individually, jointly and severally, for Damages.

110. On information and belief and given that the consumer credit transaction was an inter-temporal transaction with multiple assignments as part of an aggregation and the creation of a REMIC tranche itself a part of a predetermined and identifiable CMO, all Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Petitioners out of the proceeds of the

loan; acted in concert to wrongfully deprive the Petitioners of their home; acted in concert and conspiracy to essentially steal the Petitioners' home and/or convert the Petitioners' home without providing the Petitioners reasonably equivalent value in exchange; and, conducted an illegal enterprise within the meaning of the Federal RICO statutes.

111. Based on information, S.E.C. filings and recent public disclosures regarding massive mortgage fraud, and given the volume of residential loan transactions solicited, processed, and/or serviced by the named corporate Defendants, **all** named live Defendants have engaged in **two** or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

///

### Enumeration of Causes of Action

**First Cause of Action: Violations of Home Ownership Equity Protection Act**

112. Petitioners reaffirm and re-allege the above paragraphs hereinabove as if set forth more fully herein below.

113. In A. D. 1994, Congress enacted the Home Ownership Equity Protection Act (**"HOEPA"**) which is codified at 15 U.S.C. Sec. 1639 et seq. with the intention of protecting homeowners from predatory lending practices targeted at vulnerable consumers. HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans. In the event of noncompliance, HOEPA imposes civil liability, allowing for **rescission,** as well as statutory and actual damages.

114. The Petitioners are "consumers" and each Defendant is a "creditor" as defined by HOEPA. In the mortgage loan transaction at issue here, the Petitioners were required to pay excessive fees, expenses, and costs which exceeded more than 10% of the amount financed.

115. Pursuant to HOEPA and specifically 15 USC Sec. 1639(a)(1), each Defendant is required to make certain disclosures to the Petitioners which are to be made conspicuously and in writing no later than three (3) days prior to the closing.

116. In the transaction at issue, Defendants were required to make the following disclosure to Petitioners by no later than three (3) days prior to said closing:

"You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligation under the loan."

117. Defendants violated HOEPA by numerous acts and material omissions, including but not limited to:

(a) failing to make the foregoing disclosure in a conspicuous fashion;

(b) engaging in a pattern and practice of extending credit to Petitioners without regard to their ability to repay in violation of 15 USC Sec. 1639(h).

118. By virtue of the Defendants' multiple violations of HOEPA, the Petitioners have a legal right to rescind the consumer credit transaction the subject of this action pursuant to 15 USC Sec. 1635. **This Amended Petition and Complaint is to be construed, for these purposes, as formal and public notice of Petitioners' Notice of Rescission of the Deed of Trust and Note**.

119. Defendants further violated HOEPA by failing to make additional disclosures, including but not limited to Petitioners not receiving the required disclosure of the right to rescind the transaction; the failure of Defendants to provide an accurate TILA disclosure; and the amount financed being understated.

120. As a direct consequence of and in connection with Petitioners' legal and lawful exercise of their right of rescission, the **true "lender"** is **required, within** twenty (20) days of this **Notice of Rescission**, to:

(a) desist from making any claims for finance charges in the transaction;

(b) return all monies paid by Petitioners in connection with the transaction to the Petitioners;

(c) satisfy all security interests, including mortgages, which were acquired in the transaction.

121. Upon the true "lenders" full performance of its obligations under HOEPA, Petitioners shall tender all sums to which the true lender is entitled.

122. Based on Defendants' HOEPA violations, each of the Defendants is liable to the Petitioners for the following, which Petitioners lawfully demand as relief:

      (a) rescission of the mortgage loan transactions;

      (b) termination of the mortgage and security interest in the property the subject of the mortgage loan documents created in the transaction;

      (c) return of any money or property paid by the Petitioners including all payments made in connection with the transaction;

      (d) an amount of money equal to twice the finance charge in connection with the transaction;

      (e) relinquishment of the right to retain any proceeds; and

      (f) actual damages in an amount to be determined at trial, including legal research fees.

///

## Second Cause of Action: Violations of Real Estate Settlement Procedures Act

123. Petitioners reaffirm and re-allege paragraphs above herein as if specifically set forth more fully herein below.

124. As mortgage lenders, Defendants are subject to the provisions of the Real Estate Settlement Procedures Act ("**RESPA**"), 12 USC Sec. 2601 et seq.

125. In violation of 12 USC Sec. 2607 and in connection with the mortgage loan to Petitioners, Defendants accepted charges for the rendering of real estate services which were in fact charges for other than services actually performed.

126. As a result of the Defendants' violations of RESPA, Defendants are liable to Petitioners in an amount equal to three (3) times the amount of charges paid by Petitioners for "settlement services" pursuant to 12 USC Sec. 2607(d)(2).

///

## Third Cause of Action: Violations of Federal Truth-In-Lending Act

127. Petitioners reaffirm and re-allege paragraphs above hereinabove as if set forth more fully herein below.

          Amended Petition and Complaint for Civil Damages, *inter alia*

128. Defendants failed to include and disclose certain charges in the finance charge shown on the required Federal Truth-In-Lending Act ("**TILA**") statement, which charges were imposed on Petitioners incident to the extension of credit to the Petitioners and were required to be disclosed pursuant to 15 USC Sec. 1605 and Regulation Z Sec. 226.4, thus resulting in an improper disclosure of finance charges in violation of 15 USC Sec. 1601 et seq., Regulation Z Sec. 226.18(d). Such undisclosed charges include a sum identified on the Settlement Statement listing the amount financed which is different from the sum listed on the original Note.

129. By calculating the annual percentage rate ("APR") based upon improperly calculated and disclosed amounts, Defendants are in violation of 15 USC Sec. 1601 *et seq.*, Regulation Z Sec. 226.18(c), 18(d), and 22.

130. Defendants' failure to provide the required TILA disclosures provides Petitioners with the **right to rescind** the transaction, and Petitioners, through this public Complaint which is intended to be construed, for purposes of this claim, as a **<u>formal</u> Notice of Rescission**, hereby elect to rescind the transaction.

///

### Fourth Cause of Action: Fraudulent Misrepresentation

131. Petitioners reaffirm and re-allege paragraphs above as if set forth more fully herein below.

132. All named live Defendants knowingly and intentionally concealed material information from Petitioners which is required by Federal Statutes and Regulations to be disclosed to the Petitioners both before and at the closing.

133. All named live Defendants also materially misrepresented material information to the Petitioners with full knowledge by said Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made. Under the circumstances, the material omissions and material misrepresentations of the named live Defendants were malicious.

134. The Petitioners, not being investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan

documents. Had the Petitioners known of the falsity of Defendants' representations, Petitioners would not have entered into the transaction that is the subject of this action.

135. As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Petitioners have suffered damages.

///

### Fifth Cause of Action: Breach of Fiduciary Duty

136. Petitioners reaffirm and re-allege paragraphs above as if set forth more fully herein below.

137. Defendants, by their actions in contracting to provide mortgage loan services and a loan program to the Petitioners that was not only to be best suited to the Petitioners given their income and expenses, but by which Petitioners would also be able to satisfy their obligations without risk of losing their home, were "fiduciaries" in which the Petitioners reposed trust and confidence, especially given that the Petitioners were not and are not investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

138. Defendants breached their fiduciary duties to the Petitioners by fraudulently inducing Petitioners to enter into a mortgage transaction which was contrary to the Petitioners' stated intentions; contrary to the Petitioners' interests; and contrary to the Petitioners' preservation of their home.

139. As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Petitioners have suffered damages.

140. Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a callous and reckless disregard for the rights of the Petitioners justifying an award of not only actual compensatory but also exemplary/punitive damages to serve as a deterrent not only as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

///
///

### Sixth Cause of Action: Unjust Enrichment

141. Petitioners re-allege and reaffirm paragraphs above as if set forth more fully herein below.

142. Defendants had an implied contract with the Petitioners to ensure that the Petitioners understood all fees which would be paid to the Defendants to obtain credit on Petitioners' behalf and to not charge any fees which were not related to the settlement of the loan and without full disclosure to Petitioners.

143. The live agents of Defendant NEW CENTURY MORTGAGE had full knowledge that a "bait and switch" fixed rate predatory mortgage with an increase in the interest rate due to the YSP paid to the Broker for the "up sell" was not in the Petitioners' best interests.

144. The live agents of Defendant NEW CENTURY MORTGAGE cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains and YSP fee unrelated to the settlement services provided at closing.

145. The live agents of Defendant NEW CENTURY MORTGAGE have been unjustly enriched at the expense of the Petitioners, and maintenance of the enrichment would be contrary to the rules and principles of equity.

146. The Petitioners thus lawfully demand restitution from the live agents of Defendant NEW CENTURY MORTGAGE in the form of actual damages, exemplary damages, legal research costs and court fees.

///

### Seventh Cause of Action: Civil Conspiracy

147. The Petitioners reaffirm and re-allege paragraphs above as if set forth more fully herein below.

148. In connection with the application for and consummation of the mortgage loan the subject of this action, Defendants agreed, between and among themselves, to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Petitioners.

149. Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of and detriment to the Petitioners.

150. The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Petitioners.

151. As a direct and proximate result of the actions of the Defendants in combination resulting in fraud and breaches of fiduciary duties, the Petitioners have suffered damages.

152. The Petitioners thus demand an award of actual, compensatory, and punitive damages.

///

### Eighth Cause of Action: Civil Damages for RICO Violations by All Defendants

153. The Petitioners reaffirm and re-allege paragraphs above as set forth more fully herein below.

154. All named party Defendants are "persons" as defined by 18 USC Sec. 1961(3).

155. The RICO "enterprise" that is the subject of this action has existed from date of application to the present, with the injuries and damages resulting there from being continuing.

156. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Petitioners constitutes an "enterprise", with the aim and objective of the enterprise being to perpetrate a fraud upon the Petitioners through the use of intentional nondisclosure, material misrepresentation, and creation of fraudulent loan documents.

157. Each of the named party Defendants is an "enterprise Defendant".

158. As a direct and proximate result of the actions of the Defendants, Petitioners have and continue to suffer damages.

///

### Ninth Cause of Action: <u>Quiet Title to 2036 Pleasant Creek Road, Rogue River, Oregon</u>

159. The Petitioners re-allege paragraphs ¶¶ 1-158 of this Amended Petition and incorporate the same by reference as if fully copied and restated herein below.

160. The Petitioners now sue for **quiet title** to **2036 Pleasant Creek Road, Rogue River**, Oregon pursuant to the Oregon quiet title statute contained in **Section 28.010** of the Oregon Revised Statutes (ORS), which governs quiet title actions in Oregon.

161. As authorized by ORS 28.010 et seq., the Petitioners assert this claim to establish their lawful title to the aforesaid 2036 Pleasant Creek Road, against the adverse claims of Defendants U.S. BANK, SAXON and OCWEN; and, all JANE and JOHN DOES that may or may not have a supposed interest in the title to 2036 Pleasant Creek Road, Rogue River, Oregon.

162. As noted *supra*, the Petitioners define JANE and JOHN DOES as including anyone who may have any supposed interest in Title. The Petitioners believe that, given the current state of this economy (which is rife with fraud) that there could be other fraudulent parties, outside of Defendant U.S. BANK, Defendant SAXON and Defendant OCWEN that may assert a claim against the Title to the Petitioners' home, *i.e.*, 2036 Pleasant Creek Road, Rogue River.

163. Jurisdiction and Venue are proper pursuant to the Oregon quiet title statute because the private land and dwelling house commonly known as 2036 Pleasant Creek Road, Rogue River, the principal property in question for which quiet title is sought, is located in the County of Jackson within the territorial jurisdiction of the State of Oregon.

164. After filing their Amended Petition and Complaint for Damages with Clerk of this Court the Petitioners will file a *lis pendens* as required by Oregon law (*i.e.,* ORS 93.740) with the County Recorder of Jackson County, Oregon. Pursuant to ORS 93.740 the Petitioners identify the private land and dwelling house commonly known as 2036 Pleasant Creek Road, Rogue River, Oregon, as being legally described as:

> The East Half of the Southeast Quarter of the Southwest Quarter of the Northwest Quarter of Section 3, Township 35 South, Range 4 West of the Willamette Meridian in Jackson county, Oregon. TOGETHER WITH AND SUBJECT to a nonexclusive easement for ingress and egress to Pleasant Creek County Road, as set forth in

Document No. 67-12050, Official Records of Jackson County, Oregon.

165. The Petitioners lawfully request relief that this honorable Court grant quiet title to the Petitioners, because Defendant U.S. BANK's encumbrance on the subject property entirely depends on a contract with the Petitioners which was either void *ab initio* for the simple reasons that (a) Defendant New Century Mortgage undertook not to assume and accept no detriment to itself nor any entity under its control, and there was accordingly no mutuality of consideration, (b) even if Defendant New Century Mortgage were a bona fide contracting party on origination, after securitization of the Petitioners' "NOTE", Defendant U. S. Bank surrendered its status as holder-in-due-course of the Petitioners' "NOTE", and ceased to have any privity of contract whatsoever with the Petitioners.

166. To this end, the Petitioners ask this honorable Court to devise a means of publishing or effectively noticing the purchasers of their securitized mortgage note to appear and answer this Amended Petition and Complaint or be forever barred from doing so, even if the JOHN DOES or JANE DOES or corporations who are the actual holder-in-due-course of the Petitioners' "NOTE" reside in the United States or are incorporated abroad or do business abroad.

167. The Petitioners reserve the right to further amend the instant Amended Petition and Complaint further to conform with Federal law before any final determination of the legal sufficiency of the instant Amended Petition and Complaint.

168. The Petitioners request that the honorable Court will hold a hearing to examine into and determine the Petitioners' Claims against all of the Defendants, and that upon final Trial-by-Jury, demand for which is hereby made and tendered, that the Court will award Petitioners quiet title to their property, the subject of this lawsuit, ordering that all encumbrances and liens, including the "DEED OF TRUST" filed by or on behalf of Defendant U.S. BANK, or any other party be ordered stricken and removed from the public property records of Oregon, or else expunged and marked as "VOID" if otherwise required to remain in the public property records of each relevant county.

Amended Petition and Complaint for Civil Damages, *inter alia*

169. **WHEREFORE**, the Petitioners move and lawfully request that this honorable Court declare and adjudge that Defendant U.S. Bank does not have, and never had, any legal right, title, nor any equitable or beneficial interest in the enforcement of the Petitioners' "NOTE", and should be both temporarily and permanently enjoined from proceeding against the private land and dwelling house commonly known as 2036 Pleasant Creek Road, Rogue River, Oregon.

///

## Remedy and Lawful Relief Sought

170. Petitioners lawfully request judgment against all Defendants for the relief requested above, including but not limited to declaratory judgment regarding the rights and status of each party in relation to the property at 2036 Pleasant Creek Road, Rogue River, Oregon, and the interests assigned to Petitioners in such property and the note, transactions, and occurrences relating to the same;

171. **Trial by Jury** on all Issues triable by a Jury of the Petitioners' Peers; and,

172. In harmony with, and in the nature of, the civil penalties authorized by Title 18, Section 1964 (a) and (c), the live Petitioners are entitled to a judgment **three-fold** the actual money damages (*i.e.*, 183,000.00 U.S.D.) claimed by the alleged authorized live agents of Defendant U.S. BANK in the sum certain amount of five-hundred-forty-nine-thousand United States Dollars (549,000.00 U.S.D.); and,

173. A properly signed order with the seal of this Court affixed, directing the Defendants, joint and several, to pay all of the Petitioners' costs of defending against the aforesaid frivolous and fraudulent non-judicial foreclosure proceedings; and,

174. By **operation of law**, to give such other and further Relief to the Petitioners damaged by the corporate Defendants' live agents as this honorable Court deems just and equitable to maintain the Public's confidence in the judicial integrity of the courts; and,

175. Petitioners reserve their Right to amend this Complaint once discovery has begun.

Amended Petition and Complaint for Civil Damages, *inter alia*

Done and dated by our hand on this _eighteenth_ Day of the Tenth Month, A. D. Two-thousand-ten; and, of the Independence of these united states of America, the two hundred and thirty-fourth year, under restricted signature, that is to say, with all our constitutionally protected birthright Prerogatives, Immunities, and unalienable Rights reserved, and all lawful Remedies preserved,

Kathleen Harrison: Smith, *in esse,* Plaintiff          Larry Denton: Smith, *in esse,* Plaintiff

///

## Affidavit in Support of Complaint for Civil RICO Damages, inter alia

Larry Denton and Kathleen Harrison [Family: Smith], the live Christian people and two constituent Members of the American Sovereignty, of *jura regalia* capacity, hereinafter referred to as "Affiants", living upon the soil on Oregon (ordained and established on the fourteenth day of February, A. D. 1859), one of the several states of these united states of America, make this affidavit of their own free will, from their personal first-hand knowledge, do hereby solemnly affirm that the following statements are true, correct and materially complete and are not intended to mislead:

1. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves Affiants are not live Christian people, peacefully and lawfully living upon the Land in the *de jure* sovereign republic state of Oregon.

2. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves Affiants are not of sound Mind, sufficient Age and Discretion to make the Statements herein.

3. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves Affiants are not fully competent to conduct all their own Affairs of State, both private and public.

4. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that Affiants are not live constituent Members of the American Sovereignty living within the surveyed territorial Boundaries of Oregon, within the geographical boundaries of the county of Jackson.

5. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **denies any such evidence exists**, which

conclusively proves that **Equality of the Law** is not Paramount and **Mandatory by Law**.

6. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **denies any such evidence exists**, which conclusively proves that Defendant U.S. BANK has standing to seek any relief to enforce an **illegal contract**.

7. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **denies any such evidence exists**, which conclusively proves that Defendant U.S. BANK is the owner or holder-in-due-course of the Petitioners' <u>original</u> "debt instrument", which is secured by the Deed of Trust against the Petitioners' private land and principal dwelling house located at 2036 Pleasant Creek Road, Rogue River, Oregon.

8. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that in order to recover on Affiant's <u>original</u> "debt instrument", the live agents of Defendant U.S. BANK are not first <u>required</u> to prove: **(1)** the **existence** of the original instrument in question; **(2)** that the Party sued <u>signed</u> the Note (absent Fraud in the Inducement); **(3)** that Defendant U.S. BANK is actually **in possession** of the original instrument; and, **(4)** that a certain balance is due and owing on the instrument [see: *e.g.*, *In Re: SMS Financial LLC. v. ABCO Homes, Inc.*, 167 F.3d. 235 (5th Circuit Court of Appeals - 1999)].

9. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that Defendant U.S. BANK was, in fact, in actual possession of the original unaltered "NOTE", which is **secured** by the "DEED OF TRUST" against the private land and dwelling house commonly known as 2036 Pleasant Creek Road, Rogue River, situate within the geographical boundaries of Jackson county, Oregon, **prior to** the corporate Defendant's live agents initiating the aforesaid statutory non-judicial foreclosure proceedings against the Petitioners' property rights and interests in the aforesaid private land and principal dwelling home.

10. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **denies any such evidence exists**, which conclusively proves that the Petitioners owe Defendant U.S. BANK any money.

11. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that as a result of the continuing actions of the live agents of corporate Defendants U.S. BANK, NEW CENTURY MORTGAGE, SAXON and OCWEN, also specifically including all live Defendants, the Affiants have not been injured, and will not continue to be injured, financially, socially, and emotionally unless a preliminary (protective) injunction is immediately issued.

12. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **denies any such evidence exists**, which conclusively proves that the live agents of corporate Defendants U.S. BANK, NEW CENTURY MORTGAGE, SAXON and OCWEN, also specifically including all live

Amended Petition and Complaint for Civil Damages, *inter alia*

Defendants, by their specialized educations and/or on-the-job technical training required to be competent in their respective occupations, are not imputed to be thoroughly conversant with the controlling Federal law in the instant Matter [*i.e.,* **Federal Fair Debt Collection Practices Act** (FDCPA), 15 U.S.C., Section 1692 *et. seq.*], as well as the **Federal criminal** and **civil penalties** for **aiding** in the **collection** of an **unlawful debt** [see: *e.g.,* defendants' "UNITED STATES CODE", Title 18, Sections, 2, 3, 4, 241, 891-894, 1341, 1342, 1343, 1346, 1956, 1957, 1961, 1962, 1963 and 1964 *et seq.*].

13. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that the live Petitioners in the instant commercial Matter are not entitled to a money judgment for **triple damages**, in the sum certain amount of five-hundred-forty-nine thousand United States Dollars (549,000.00 U.S.D.) for the willful, wanton and criminally negligent actions of the live agents of corporate Defendants U.S. BANK, NEW CENTURY MORTGAGE, SAXON and OCWEN, also specifically including all live Defendants, acting in concert against the private Property and property Rights of the Petitioners in the instant private commercial Matter.

14. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that Substantive Due Process of Law does not require that **every litigant's** claim is heard by <u>fair and impartial</u> Fact Finder and is not applicable to **administrative** as well as **judicial proceedings**, including the instant commercial Matter [see: *e.g., Porter v. Singletary*, 49 F. 3d 1483 (1995)].

15. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that **any judge** or **magistrate** has lawful Authority to **commit**, or authorize someone else to commit, any **criminal offense** in or out of the presence of the court [see: *e.g., Olmstead vs. United States*, 277 U.S. 438, 485; 48 S. Ct. L. Ed. 944 (1928); see also, *People ex rel. Sammons v. Snow*, 72 A.L.R. 798].

16. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that though the law itself is fair on its face, and impartial in appearance, yet, <u>if it is applied and administered by public authority with an evil eye and an unequal hand</u>, so as **practically** to make **unjust** and **illegal discriminations** between people or persons in similar circumstances, **material to** their **rights**, the **denial of equal justice** is not still within the prohibition of the federal Constitution [see: *e.g., Yick Wo v. Hopkins*, 118 U. S. 356 (1886)].

17. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that if any live man or woman, in *sui juris* Capacity, desires to answer or rebut this Affidavit point-by-point, he or she is not required, by **operation of law**, to do so in like manner of this Instrument. That is to say, by a notarized Affidavit sworn or affirmed to be true, correct <u>and</u> **materially complete**, using his or her Christian Title (*i.e.,* secular "given" Name) and Family Name (*i.e.,*

secular "surname") for signature and filing the same with the clerk of the district court for the United States for the District of Oregon (Medford Division); and, then sending a true copy to the **Petitioners**, whose **name and mailing location** is provided at the top left of the first page of the instant Complaint.

18. **Affiants** have seen no lawful Evidence perfected into any lawful or legal Record, judicial or administrative, and **deny any such evidence exists**, which conclusively proves that the failure of the Defendants named in the foregoing Complaint to lawfully respond **within sixty** (60) **days** of verified receipt of a true copy of this Affidavit and rebut, with particularity, the statements of Material Fact in the instant Affidavit will not comprise such Defendants' complete agreement with, and unqualified **Admission** and open **Confession** to, the truth of all Material Facts stated in the instant Affidavit, standing un-rebutted **upon the face of the court Record**.

Further the Affiants say naught.

### **Verified on Affirmation of Larry Denton and Kathleen Harrison** [Family: Smith]

state**: Oregon**            }
                             }   solemnly subscribed and affirmed:
county: **Josephine**        }

**Larry-Denton** and **Kathleen-Harrison** [Family: Smith], the above Affiants, on Affiants' own unlimited commercial Liability, do hereby certify that Affiants have read the foregoing **Affidavit of Truth** and do know that the Material Facts contained therein are true, correct, materially complete and are not intended mislead; in plain English, are the truth, the whole truth, and nothing but the truth to the best of Affiants' own first-hand knowledge and understanding, under the pains and penalties for giving false Testimony, in accordance with the general Laws of these united States of America, the general Laws of Oregon, and the Law of Nations. If the Affiants are called and sworn to testify, Affiants are fully competent to testify as to the truth of the Matters stated in the aforesaid Affidavit of Truth.

Done and dated by our hand on this *eighteenth* _____ Day of the Tenth Month, in the Year of our Lord Yahushua, The Christ, Two-thousand-ten; and, of the Independence of these united states of America, the two hundred and thirty-fourth year, under **restricted signature**, that is to say, with all our constitutionally protected birthright Prerogatives, Immunities, and unalienable Rights reserved, and all lawful Remedies preserved,

Amended Petition and Complaint for Civil Damages, *inter alia*

_(signature)_                                   _(signature)_

Kathleen Harrison, *in esse,* Affiant          Larry Denton, *in esse,* Affiant

**Notice and Caveat**: The use of the Notary Public is only for positive identification of Affiants' natural body (state), to provide Notary witness to Affiants' attestation of the Truth of the Statements made in the foregoing Instrument and for Notary attestation of the authenticity of Affiants' signature subscribed to said Instrument, and such use **does not** grant any undisclosed authority or jurisdiction to anyone or anything

### Notary Public Certification

state**: Oregon**          }
                           }  solemnly subscribed and affirmed:
county: **Josephine**      }

Before me, ___Shawn B Butler___, the undersigned Notary Public, appear the two live Christian people personally known to me, **Larry Denton** and **Kathleen Harrison** [Family: Smith], and they do solemnly attest and affirm the Truth of the Statements made in the foregoing Instrument, and by their voluntary act affix their signature to the same on this __18th__ day of October, A. D. 2010. I certify that the above Verified Affidavit of Truth was done at __Grants Pass__, Oregon on the aforesaid day and year last stated.

**Witness:** my hand and official notary stamp.    {notary stamp}

_(signature)_

Notary Public for STATE OF OREGON

My commission expires: __Apl 16__, A. D. 20__12__.

> OFFICIAL SEAL
> **SHAWN B BUTLER**
> NOTARY PUBLIC - OREGON
> COMMISSION NO. 428132
> MY COMMISSION EXPIRES APRIL 16, 2012